**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| COMMUNICATION INTERFACE TECHNOLOGIES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>INTERNATIONAL DAIRY QUEEN, INC.,<br><br>Defendant. | **Civil Action No.:**<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Communication Interface Technologies, LLC ("CIT" or "Plaintiff"), for its

Complaint against Defendant International Dairy Queen, Inc. ("Dairy Queen" or "Defendant"),

alleges the following:

### NATURE OF THE ACTION

1.      This is an action for patent infringement arising under the patent laws of the

United States, 35 U.S.C. § 1 *et seq.*

### THE PARTIES

2.      Plaintiff CIT is a limited liability company organized under the laws of the state

of Delaware with a place of business at 3107 Boardwalk, Atlantic City, NJ 08401.

3.      Upon information and belief, Dairy Queen is a corporation organized and existing

under the laws of the state of Delaware, with a principal place of business located at 8331

Norman Center Drive, No. 700, Bloomington, Minnesota 55437.

4.      Upon information and belief, Dairy Queen sells and offers to sell products and services throughout the United States, including in this District, and introduces products and services into the stream of commerce and incorporates infringing technology knowing that they would be sold in this District and elsewhere in the United States.

## JURISDICTION AND VENUE

5.      This is an action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code.

6.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. §1400(b).  On information and belief, Dairy Queen has committed acts of infringement in this District and maintains multiple established places of business in the state of Texas and in this District, specifically including the Dairy Queen locations at 1) 2425 Avenue K, Plano, Texas, 75074, 2) 2240 Coit Road, Plano, Texas 75075 and 3) 719 East Main Street, Allen, Texas, 75075.

8.      Upon information and belief, Dairy Queen is subject to this Court's general and specific personal jurisdiction due at least to their substantial business in Texas and in this District, directly or through intermediaries, including: (i) at least a portion of the infringements alleged herein; and (ii) regularly doing or soliciting business, engaging in other persistent courses of conduct and/or deriving substantial revenue from goods and services provided to individuals and entities in the State of Texas.

## BACKGROUND OF THE PATENTS IN SUIT

### The Invention

9.      Eric Morgan Dowling and Mark Nicholas Anastasi are the inventors of U.S. patent nos. 6,574,239 ("the '239 patent"), 8,266,296 ("the '296 patent"), and 8,291,010 ("the '010 patent").  A true and correct copy of the '239 patent is attached as Exhibit 1.  A true and

correct copy of the '296 patent is attached as Exhibit 2.  A true and correct copy of the '010

patent is attached as Exhibit 3.

10.     The '239 patent, the '296 patent, and the '010 patent resulted from the pioneering

efforts of Dr. Dowling and Mr. Anastasi (hereinafter "the Inventors") in the late 1990s, in the

area of quickly resumed client-server communication sessions.  (See Ex. 8, Dowling Decl., ¶¶ at

15-19.)[1] These efforts resulted in the development of methods and apparatuses for virtual

connection of a remote unit to a server and methods and apparatuses for application-layer

evaluation of communications received by a mobile device. (*See id.* at ¶¶ 17, 19, 21.)

11.     At the time of these pioneering efforts, the most widely implemented technology

that was in use involved client-server communication sessions that could be instantiated and torn

down.  (*See id.* at ¶ 15.)  If communications between client and server were needed again, the

widely implemented technology would simply instantiate a brand-new session between the same

client and server.  (*See id.*)  Secure Sockets Layer (SSL) is an example of the earlier technology.

Unlike Transport Layer Security (TLS), SSL did not allow session reactivation, and instead

required a new session to be negotiated from scratch after an older session was deactivated (torn

down).

12.     Creating a new session required the renegotiation of a set of session keys that

included computation of new cryptographic keys.  (*See id.* at ¶ 15.)  This process required

significant start up times and computational resources.  (*See id.*)  The invention encompassed by

the patents in suit, instead of tearing down an old session and instantiating a new session, places

---

[1] The Dowling Declaration in Exhibit 8, was prepared originally in support of a prior complaint
that was filed in the Central District of California, involving the same parties and the same
issues, which has since been dismissed.  CIT is in the process of executing a new version of the
same Declaration with this Court's caption and will file that as a replacement in short order.

the old session into an inactive state, and then reactivates the old session to place it back into the active state using a much shorter renegotiation sequence that makes use of saved session parameters.  (*See id.* at ¶ 26.)  The saved session parameters include precomputed client-server encryption keys that are used to quickly and efficiently reactivate the inactive sessions.  Some embodiments allow the session layer connection between the client and server devices to be reactivated without the need to create a new session by negotiating new session parameters and session keys.  (*See* Exhibit 1 at Figs. 1A, 2, 3:45-63, 8:34-9:14, 9:54-60.)  Other embodiments additionally or alternatively allow the application layer session to be reactivated without the need for the user to enter his/her user authentication credentials at the time of each session reactivation.

13.     The Inventors first conceived of the inventions claimed in the '239 patent, the '296 patent, and the '010 patent as a way to shorten the connection time of the dialup modems in use back in the 1990s.  (*See* Ex. 8 at ¶ 16.)  Each time a new dialup modem connection needed to be reestablished, there would be a several-second period (typically around 10-12 seconds) during which the user would hear audio modem tones and hissing sounds while the modems reconnected and negotiated a new data session.  (*See id.*)  The virtual session inventions allowed the modems to reconnect by remembering the previously negotiated modem parameters, thereby greatly shortening this renegotiation time to being almost unnoticeable. (*See* Ex. 1 at 13:42-43, 17:50-58; Ex. 8 at ¶ 16.)

14.     While developing their invention, the inventors contemplated virtual sessions would also be very useful in wireless applications  (*see, e.g.*, Ex. 1 at Fig. 2, 9:32-35, 13:4-8) to allow a client-side remote unit to maintain a virtual presence with a remote server.  (*See* Ex. 8 at ¶ 17.)  The inventors taught that virtual sessions could be layered over wireless connections to

allow remote units such as wireless Internet devices to be virtually connected to one or more server-side application programs running on one or more remote server systems without wasting wireless physical layer resources to maintain the one or more session layer connections.  (*See* Ex. 1 at 9:28-60; Ex. 8 at ¶ 17.)  The physical layer could be inactive, while the virtual session layer connections could be maintained without using wireless resources. (*See* Ex. 1 at 3:45-49, 8:56-58, 9:7-10; Ex. 8 at ¶ 17.)  When the client-side remote unit needed to communicate with the server, or when the server needed to send newly received information to the remote unit, the virtual session could be reactivated without the need to tediously set up and authenticate a new secure cryptographic session with the server. (*See* Ex. 1 at Fig. 1A, 9:53-60, 13:48-14:17; Ex. 8 at ¶ 17.)

     15.     For example, the inventors developed methods for controlling virtual sessions between a server-side program and a client-side application program.  (*See* Ex. 1 at 14:32-43.) When the virtual session is not needed, it is placed into an inactive state (like a sleep state).  (*See, e.g.*, Ex. 1 at 3:45-49, 10:6-11:22; Ex. 2 at 3:56-60.)  In this state, no communication resources are used.  (See Ex. 1 at 3:37-44, 17:36-45.)  When a virtual session is needed again, for example when the server receives new information for the client-side application program, the server can, for example, send a message that causes the client-side application program to resume the virtual session with the server.  (*See* Ex. 1 at 3:60-63.)  This session resumption is accomplished using saved session parameters instead of going through the full session authentication and negotiation process, as was needed in the prior art.  In modern day parlance, the client-side application program is typically called an "App."

**Advantage Over the Prior Art**

16.    The patented inventions disclosed in the '239 patent, the '296 patent, and the '010 patent provide many advantages over the prior art, and in particular improved the operations of communications between remote units such as wireless computing and communications devices and remote servers.  (*See* Ex. 1 at Figs. 1, 2; Ex. 2 at 3:48-4:39; Ex. 3 at 3:48-4:39.)  One advantage of the patented inventions is providing systems and methods to enable users such as remote workers or other types of users to stay connected to one or more central servers without the need to continuously remain connected via one or more physical channels.  (*See, e.g.*, Ex. 1 at 3:37-40; Ex. 2 at 3:48-51; Ex. 3 at 3:48-51; Ex. 8 at ¶ 25.)  A central aspect of the inventions is the concept of fast reconnect.  (*See, e.g.*, Ex. 1 at Abstract, 17:50-58; Ex. 2 at Abstract.)  Users of remote devices can reconnect via a previously established communication session to a server-side application program, without the need to use the prior art's long and tedious session establishment procedures each time a reconnect is needed after a session has been deactivated. (*See* Ex. 1 at 12:49-53, 17:36-42; Ex. 8 at ¶¶ 20, 25.)

17.    Another advantage offered by the patented inventions is to allow a remote unit to maintain a private/secured session layer connection to support communication between a client-side application program and a server-side application program over long periods of session inactivity.  (*See* Ex. 8 at ¶ 25.)  This may be achieved, for example, by computing cryptographic session parameters (e.g., according to public key cryptography techniques) that can be used to quickly resume the session without the user needing to start a new authentication process from scratch.  (*See* Ex. 1 at 3:2-5, 3:55-60, 4:22-25, 8:45-53, 10:2-15, 10:51-55, 10:57-62, 11:15-21, 14:32-33, 18:61-66, 20:40-43, 20:50-55, 21:49-55, 22:1-7; Figs. 6, 7; Ex. 8 at ¶ 25.)  This connection can be referred to as a sustained secure connection that persists, for example, when

the user has turned off his or her user device or put it in airplane mode and then turned it back on again.  In the prior art, the secure cryptographic session would need to be terminated under such conditions, and a new secure session between the client and the server would need to be established from scratch.  The session layer connection can preferentially be used to support various different kinds of application layer communications between the remote unit and the server-side application program.  (*See* Ex. 1 at Figs. 1A, 2, 3:45-63, 8:34-9:14, 9:54-60.)

18.    Another advantage offered by some embodiments of the patented inventions of the patents in suit is to allow a user using a remote unit to maintain a private/secured logon type session between a client-side application program and a server-side application program over longer periods of time, without the need for the user to repeatedly reenter his or her logon credentials such as username and password. This is achieved by computing cryptographic session parameters (*e.g.*, according to public key cryptography techniques) that can be used to quickly resume the session without the user needing to start a new authentication process from scratch.  (*See* Ex. 1 at 3:2-5, 3:55-60, 4:22-25, 8:45-53, 10:2-15, 10:51-55, 10:57-62, 11:15-21, 14:32-33, 18:61-66, 20:40-43, 20:50-55, 21:49-55, 22:1-7, Figs. 6, 7; Ex. 8 at ¶ 25.)  This can be referred to as a sustained secure connection that persists, for example, when the user has turned off his or her user device or put it in airplane mode and then turned it back on again. In the prior art, the secure cryptographic session would need to be terminated under such conditions, and a new secure session between the client and the server would need to be manually established in which the user would need to present his or her user credentials to establish a new session.

19.    Another advantage offered by the patented inventions of the patents in suit is that the invention contemplated that the remote unit 100 of Fig. 1 and Fig. 2 of the '239 patent would be able to wirelessly connect (207) (Ex. 1 at Fig. 2) to a plurality of different server-side

application programs (220) (Ex. 1 at Fig. 2).  (*See also* Ex. 1 at 7:21-25, 7:50-52, 14:62-64.)

Typically, a smart phone device will have many different downloaded Apps, and each App will

communicate with its own corresponding remote server-side application program.  Furthermore,

as disclosed in the '239 patent (Ex. 1 at 7:41-44), each such connection between each App on the

remote unit and each different server-side application program could be connected by its own

virtual session, using a separate set of saved session parameters including cryptographic session

reauthentication parameters for fast/accelerated session reconnect.  The prior art required all the

different sessions to be tediously and manually established and torn down each time they were

separately needed.  (*See* Ex. 1 at 7:56-8:10, 17:50-54, 18:40-48, 19:57-60; Ex. 8 at ¶ 20.)

20.     Yet another advantage offered by various embodiments of the patented inventions

of the patents-in-suit is that any given server-side application program can use a table to maintain

multiple virtual sessions with a plurality of remote units using a database of pre-computed and

prestored cryptographic session keys.  (*See* Ex. 1 at 8:61-9:4, 10:57-59, 11:12-21; Ex. 8 at ¶¶ 20-

21.)  That is, the server-side application program can manage a large number of secure

cryptographic virtual sessions with a large number of different client-side wireless remote units

that have downloaded the corresponding client-side App.  (*See, e.g.*, Ex. 1 at Fig. 2, 9:61-10:13.)

The prior art required these different sessions to be tediously and manually established and torn

down each time they were separately needed.

21.     Yet another advantage offered by various embodiments of the patented inventions

of the patents-in-suit is that the virtual session can be reactivated based on either the remote unit

requesting data or the server sending data.  (*See* Ex. 1 at Figs. 3, 7, 13:21-28, 13:48-54, 13:59-

14:3.)  The prior art did not provide any means to use fast virtual session reconnection

techniques to make the client/server experience seamless over extended periods of usage.  (*See*

Ex. 8 at ¶ 20.)  Instead, techniques like SSL would require new sessions to be set up and torn down over and over again.

22.    Yet another advantage offered by various embodiments of the patented inventions of the patents-in-suit is the ability of the server-side application program to send an unsolicited message to the client-side application running on the wireless remote unit to cause one or more virtual sessions to be reestablished.  (*See* Ex. 1 at 3:61-63, 13:48-14:17, 24:61-64.)  This message makes special use of saved cryptographic authentication parameters and information needed to identify the relevant client-side application program (App) that runs on the remote unit.  (*See* Ex. 1 at Figs. 7, 8.)  The specification not only describes specific exemplary embodiments that make use of caller ID type packets to send the outbound notification message, but the specification also describes many more general alternative embodiments directed toward wireless applications. (*See* Ex. 1 at 6:45-51, 13:65-14:17, 22:39-55, 22:64-23:6, 23:29-32, 23:39-64, 24:31-25:8, and 25:20-26.)

23.    Because of these significant advantages that can be achieved through the use of various embodiments of the patented inventions, the '239 patent, the '296 patent, and the '010 patent present significant commercial value for companies like Defendant.  Indeed, Defendant coordinates its products and services using its mobile Apps, providing convenience and efficiency for its customers, enhancing the customer engagement and experience of its customers, and increasing the efficiency of its own operations, in addition to other benefits.

**<u>Prior Litigation</u>**

24.    The '239 patent was previously litigated in the Eastern District of Texas (2-04-CV-00108, 2-03-CV-00465) and in the Northern District of Texas (3-04-CV-00281).  These cases settled before any claim construction hearings were conducted, although in one case a joint

claim construction and prehearing statement was submitted by the parties.  *See* Dkt. 130, *East Texas Technology Partners, L.P. v. Toshiba America, Inc., et al.*, No. 2:03-CV-465(TJW) (E.D. Tex. Jan. 5, 2005).  The '239 patent, the '296 patent, and the '010 patent were recently asserted by CIT in six cases in the Central District of California, all of which have been dismissed.

25.    The '239 patent, the '296 patent, and the '010 patent were also asserted in the past by CIT in several other cases in the Eastern District of Texas which have all been dismissed.  See e.g., *Communication Interface Technologies, LLC v. PepsiCo., Inc.* (4:20-cv-00286); *Communication Interface Technologies, LLC v. Rent-A-Center, Inc.* (4:20-cv-00287); *Communication Interface Technologies, LLC v. Texas Instruments, Inc.* (4:20-cv-00288); *Communication Interface Technologies, LLC v. Yum! Brands, Inc.* (4:20-cv-00289); *Communication Interface Technologies, LLC v. FedEx Corp.* (4:20-cv-00305); *Communication Interface Technologies, LLC v. Cinemark Holdings, Inc., et al.* (4:20-cv-00306); *Communication Interface Technologies, LLC v. Capital One Financial Corp.* (4:20-cv-00307); *Communication Interface Technologies, LLC v. American Messaging Services, LLC* (4:20-cv-00308); *Communication Interface Technologies, LLC v. Farmers Group, Inc.* (4:20-cv-00526); *Communication Interface Technologies, LLC v. JPMorgan Chase & Co.* (4:20-cv-00527); *Communication Interface Technologies, LLC v. TD Ameritrade, Inc.* (4:20-cv-00528); *Communication Interface Technologies, LLC v. United Parcel Service of America, Inc.* (4:20-cv-00529); *Communication Interface Technologies, LLC v. Albertson's, LLC et al.* (4:20-cv-00550); *Communication Interface Technologies, LLC v. Aldi, Inc. et al.* (4:20-cv-00551); *Communication Interface Technologies, LLC v. The Allstate Corporation et al.* (4:20-cv-00552); *Communication Interface Technologies, LLC v. Tractor Supply Company* (4:20-cv-00805); *Communication Interface Technologies, LLC v. McDonald's Corporation et al.* (4:20-cv-00804); *Communication*

*Interface Technologies, LLC v. Foot Locker, Inc.* (4:20-cv-00802); *Communication Interface Technologies, LLC v. 7-Eleven, Inc.* (4:20-cv-00800); *Communication Interface Technologies, LLC v. Teachers Insurance and Annuity Association of America et al.* (4:20-cv-00842); *Communication Interface Technologies, LLC v. Applebee's Restaurants LLC* (4:21-cv-00778); *Communication Interface Technologies, LLC v. Choice Hotel's International, Inc.* (4:21-cv-00780); and *Communication Interface Technologies, LLC v. PNC Financial Services Group, Inc.* (4:21-cv-00782), among others.

### COUNT I – INFRINGEMENT OF U.S. PATENT NO. 6,574,239

26.    The allegations set forth in the foregoing paragraphs 1 through 25 are incorporated into this First Claim for Relief.

27.    On June 3, 2003, the '239 patent, entitled VIRTUAL CONNECTION OF A REMOTE UNIT TO A SERVER was duly and legally issued by the United States Patent and Trademark Office and the '239 patent expired on or about October 7, 2018.

28.    CIT is the assignee and owner of the right, title and interest in and to the '239 patent, including the right to assert all causes of action arising under said patent and the right to any remedies for infringement of them.

29.    As set forth above, the inventions of the '239 patent resolve technical problems related to client-server computing architecture.  (*See* Ex. 8 at ¶ 21.)

30.    The claims of the '239 patent do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet.  Instead, the claims of the '239 patent recite one or more inventive concepts that are rooted in computerized client-server computing architecture technology and overcome problems

specifically arising in the realm of computerized client-server computing architecture technologies.  (*See id.* at ¶¶ 19, 21-26.)

31.    As set forth above, the claims of the '239 patent recite an invention that is not merely the routine or conventional use of computers. (*See id.* at ¶¶ 22-24.)  Instead, the invention makes use of specific client-server computer architecture functionalities.  The '239 patent claims thus specify how computing devices and remote servers are manipulated to yield a desired result.

32.    The technology claimed in the '239 patent does not preempt all ways of using client-server computing architectures or the use of all communication session technologies, or any other well-known or prior art technology.

33.    Each claim of the '239 patent recites a combination of elements sufficient to ensure that the claim in practice amounts to significantly more than a patent on an ineligible concept.

34.    As of the date of this filing, there are more than 180 licensees to the '239 patent.

35.    Upon information and belief, Dairy Queen has directly infringed under 35 U.S.C. § 271(a), literally and/or under the doctrine of equivalents, at least one claim of the '239 patent by making, using, selling, offering to sell, importing and/or providing and/or causing to be used products, specifically one or more mobile device applications, which by way of example include the Dairy Queen App:  "Dairy Queen" (the "Accused Instrumentalities").  (See, Dairy Queen App via Google Play,

https://play.google.com/store/apps/details?id=com.olo.dairyqueen.production&hl=en_US&gl=US (last accessed and downloaded January 9, 2023).)

36.     Upon information and belief, the exemplary versions herein and previous versions of the Accused Instrumentalities distributed prior to expiration of the patents in suit operated materially in the same manner.

37.     Upon information and belief, at relevant times, the Accused Instrumentalities perform a method in which wireless push notification messages are sent over TLS sessions, and the remote server and the client-side application establish a separate TLS connection for traditional client-server communications.  Earlier versions of the Dairy Queen Apps were developed and published in and before 2018 based on the version history.  (*See* https://apps.apple.com/us/app/dairy-queen/id1359480496 (last accessed and downloaded January 9, 2023).)  User reviews of prior versions of the Dairy Queen App listed on Google Play extend to well prior to the expiration of the '239 patent.  (*See* https://play.google.com/store/apps/details?id=com.olo.dairyqueen.production&hl=en_US&gl=US (last accessed and downloaded January 9, 2023).)

38.     Attached hereto as Exhibit 4, and incorporated herein by reference, is a claim chart detailing how one or more of the Accused Instrumentalities infringe claim 7 of the '239 patent.

39.     This infringement analysis is necessarily preliminary, as it is provided in advance of any discovery provided by Dairy Queen with respect to the '239 patent.

40.     CIT reserves all rights to amend, supplement and modify this preliminary infringement analysis.

41.     Nothing in the attached chart should be construed as any express or implied contention or admission regarding the construction of any term or phrase of the claims of the '239 patent.

42.    The Accused Instrumentality infringed at least one claim of the '239 patent during the pendency of the '239 patent.

43.    CIT has been harmed by Dairy Queen's infringing activities regarding the '239 patent.

## COUNT II – INFRINGEMENT OF U.S. PATENT NO. 8,266,296

44.    The allegations set forth in the foregoing paragraphs 1 through 43 are incorporated into this Second Claim for Relief.

45.    On September 11, 2012, the '296 patent, entitled APPLICATION-LAYER EVALUATION OF COMMUNICATIONS RECEIVED BY A MOBILE DEVICE was duly and legally issued by the United States Patent and Trademark Office and the '296 patent expired on or about March 30, 2019.

46.    CIT is the assignee and owner of the right, title and interest in and to the '296 patent, including the right to assert all causes of action arising under said patent and the right to any remedies for infringement of them.

47.    As set forth above, the inventions of the '296 patent resolve technical problems related to client-server computing architecture.  (*See* Ex. 8 at ¶ 21.)

48.    The claims of the '296 patent do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet.  Instead, the claims of the '296 patent recite one or more inventive concepts that are rooted in computerized client-server computing architecture technology and overcome problems specifically arising in the realm of computerized client-server computing architecture technologies.  (*See id.* at ¶¶ 19, 21-26.)

49.    As set forth above, the claims of the '296 patent recite an invention that is not merely the routine or conventional use of computers. (*See id.* at ¶¶ 22-24.)  Instead, the invention makes use of specific client-server computer architecture functionalities.  The '296 patent claims thus specify how computing devices and remote servers are manipulated to yield a desired result.

50.    The technology claimed in the '296 patent does not preempt all ways of using client-server computing architectures or the use of all communication session technologies, or any other well-known or prior art technology.

51.    Each claim of the '296 patent recites a combination of elements sufficient to ensure that the claim in practice amounts to significantly more than a patent on an ineligible concept.

52.    As of the date of this filing, there are more than 180 licensees to the '296 patent.

53.    Upon information and belief, Dairy Queen has directly infringed under 35 U.S.C. § 271(a), literally and/or under the doctrine of equivalents, at least one claim of the '296 patent by making, using, selling, offering to sell, importing and/or providing and/or causing to be used products, specifically one or more mobile device applications, which by way of example include the Dairy Queen App: "Dairy Queen" (the "Accused Instrumentalities").  (*See,* Dairy Queen App via Google Play,

https://play.google.com/store/apps/details?id=com.olo.dairyqueen.production&hl=en_US&gl=US (last accessed and downloaded January 9, 2023).)

54.    Upon information and belief, the exemplary versions herein and previous versions of the Accused Instrumentalities distributed prior to expiration of the patents in suit operated materially in the same manner.

55.    Upon information and belief, at relevant times, the Accused Instrumentalities perform a method in which wireless push notification messages are sent over TLS sessions, and the remote server and the client-side application establish a separate TLS connection for traditional client-server communications.  Earlier versions of the Dairy Queen App were developed and published in and before 2018 based on the version history.  (*See* https://apps.apple.com/us/app/dairy-queen/id1359480496 (last accessed and downloaded January 9, 2023).)  User reviews of prior versions of the Dairy Queen App listed on Google Play extend to well prior to the expiration of the '296 patent.  (See https://play.google.com/store/apps/details?id=com.olo.dairyqueen.production&hl=en_US&gl=US (last accessed and downloaded January 9, 2023).)

56.    Attached hereto as Exhibit 5, and incorporated herein by reference, is a claim chart detailing how one or more of the Accused Instrumentalities infringe claim 1 of the '296 patent.

57.    This infringement analysis is necessarily preliminary, as it is provided in advance of any discovery provided by Dairy Queen with respect to the '296 patent.

58.    CIT reserves all rights to amend, supplement and modify this preliminary infringement analysis.

59.    Nothing in the attached chart should be construed as any express or implied contention or admission regarding the construction of any term or phrase of the claims of the '296 patent.

60.    The Accused Instrumentality infringed at least one claim of the '296 patent during the pendency of the '296 patent.

61.     CIT has been harmed by Dairy Queen's infringing activities regarding the '296 patent.

## COUNT III – INFRINGEMENT OF U.S. PATENT NO. 8,291,010

62.     The allegations set forth in the foregoing paragraphs 1 through 61 are incorporated into this Third Claim for Relief.

63.     On October 16, 2012, the '010 patent, entitled VIRTUAL CONNECTION OF A REMOTE UNIT TO A SERVER was duly and legally issued by the United States Patent and Trademark Office and the '010 patent expired on or about March 30, 2019.

64.     CIT is the assignee and owner of the right, title and interest in and to the '010 patent, including the right to assert all causes of action arising under said patent and the right to any remedies for infringement of them.

65.     As set forth above, the inventions of the '010 patent resolve technical problems related to client-server computing architecture.  (*See* Ex. 8 at ¶ 21.)

66.     The claims of the '010 patent do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet.  Instead, the claims of the '010 patent recite one or more inventive concepts that are rooted in computerized client-server computing architecture technology and overcome problems specifically arising in the realm of computerized client-server computing architecture technologies.  (*See id.* at ¶¶ 19, 21-26.)

67.     As set forth above, the claims of the '010 patent recite an invention that is not merely the routine or conventional use of computers. (*See id.* at ¶¶ 22-24.)  Instead, the invention makes use of specific client-server computer architecture functionalities.  The '010 patent claims thus specify how computing devices and remote servers are manipulated to yield a desired result.

68.    The technology claimed in the '010 patent does not preempt all ways of using client-server computing architectures or the use of all communication session technologies, or any other well-known or prior art technology.

69.    Each claim of the '010 patent recites a combination of elements sufficient to ensure that the claim in practice amounts to significantly more than a patent on an ineligible concept.

70.    As of the date of this filing, there are more than 180 licensees to the '010 patent.

71.    Upon information and belief, Dairy Queen has directly infringed under 35 U.S.C. § 271(a), literally and/or under the doctrine of equivalents, at least one claim of the '010 patent by making, using, selling, offering to sell, importing and/or providing and/or causing to be used products, specifically one or more mobile device applications, which by way of example include the Dairy Queen App: "Dairy Queen" (the "Accused Instrumentalities").  (See, Dairy Queen App via Google Play,

https://play.google.com/store/apps/details?id=com.olo.dairyqueen.production&hl=en_US&gl=US (last accessed and downloaded January 9, 2023).)

72.    Upon information and belief, the exemplary versions herein and previous versions of the Accused Instrumentalities distributed prior to expiration of the patents in suit operated materially in the same manner.

73.    Upon information and belief, at relevant times, the Accused Instrumentalities perform a method in which wireless push notification messages are sent over TLS sessions, and the remote server and the client-side application establish a separate TLS connection for traditional client-server communications.  Earlier versions of the Dairy Queen App were developed and published in and before 2018 based on the version history.  (*See*

https://apps.apple.com/us/app/dairy-queen/id1359480496 (last accessed and downloaded January

9, 2023).)  User reviews of prior versions of the Dairy Queen App listed on Google Play extend

to well prior to the expiration of the '010 patent.  (*See*

https://play.google.com/store/apps/details?id=com.olo.dairyqueen.production&hl=en_US&gl=U

S (last accessed and downloaded January 9, 2023).)

74.    Attached hereto as Exhibit 6, and incorporated herein by reference, is a claim

chart detailing how one or more of the Accused Instrumentalities infringe claim 1 of the '010

patent.

75.    Attached hereto as Exhibit 7, and incorporated herein by reference, is a claim

chart detailing how one or more of the Accused Instrumentalities infringe claim 17 of the '010

patent.

76.    These infringement analyses are necessarily preliminary, as they are provided in

advance of any discovery provided by Dairy Queen with respect to the '010 patent.

77.    CIT reserves all rights to amend, supplement and modify this preliminary

infringement analysis.

78.    Nothing in the attached charts should be construed as any express or implied

contention or admission regarding the construction of any term or phrase of the claims of the

'010 patent.

79.    The Accused Instrumentality infringed at least one claim of the '010 patent during

the pendency of the '010 patent.

80.    CIT has been harmed by Dairy Queen's infringing activities regarding the '010

patent.

## **PRAYER FOR RELIEF**

WHEREFORE, CIT demands judgment for itself and against Dairy Queen as follows:

A.    An adjudication that Dairy Queen has infringed the patents in suit;

B.    An award of damages to be paid by Dairy Queen adequate to compensate CIT for Dairy Queen's past infringement of the patents in suit, including interest, costs, expenses and an accounting of all infringing acts including, but not limited to, those acts not presented at trial;

C.    A declaration that this case is exceptional under 35 U.S.C. § 285, and an award of CIT's reasonable attorneys' fees; and

D.    An award to CIT of such further relief at law or in equity as the Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

CIT hereby demands a trial by jury on all claims so triable.

Dated:   January 9, 2023                    Respectfully submitted,

                                            DEVLIN LAW FIRM LLC

                                            */s/ Timothy Devlin*
                                            Timothy Devlin (Del. Bar No. 4241)
                                            tdevlin@devlinlawfirm.com
                                            Patrick R. Delaney (DC Bar No. 472266)
                                            pdelaney@devlinlawfirm.com
                                            1526 Gilpin Ave.
                                            Wilmington, Delaware 19806
                                            Telephone: (302) 449-9010
                                            Facsimile: (302) 353-4251

                                            *Attorneys for Plaintiff,*
                                            *Communication Interface Technologies, LLC*